## Advance Thresher Company v. Fishback, et al.

(Decided February 13, 1914.)

Appeal from Woodford Circuit Court.

1. Estoppel—Foundation of Doctrine of.—The doctrine of estoppel has its foundation in the necessity of compelling the observance of good faith; but a man cannot be prevented by his conduct from asserting a previous right, unless the assertion would be an act of bad faith towards a person who had subsequently acquired the right.

2. Mortgages—Equitable Estoppel—Waiver of Lien by Mortgagee.— A mortgage of personal property, duly recorded, should not be

lightly annulled; and while we recognize that under the doctrine of equitable estoppel a mortgagee of personal property may release or waive his lien, it should never be done unless the evidence thereof be clear, full and satisfactory.

3. Estoppel—Elements Constituting.—Two of the elements necessary to constitute an estoppel are, (1) that the party to whom the statement was made must have been without knowledge or the means of knowledge of the real facts, and (2) the party to whom the representation was made must have relied on and acted upon it.

4. Mortgages—When Mortgage Not Released.—Where the purchaser of a mortgaged thresher paid his purchase money to his vendor with knowledge of all the facts concerning his vendor's solvency, and without relying upon the representation of the mortgagee upon that subject, the mortgage was not released.

C. C. BAGBY, W. D. JESSE and CHENAULT HUGUELY for appellant.

WALLACE & HARRISS for appellee Etherington.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

On December 17, 1907, the Advance Thresher Company, appellant herein, sold a threshing outfit, consisting of separator, engine, belts, &c., to Fishback for $2,340.00. Fishback executed five notes maturing on and between September 1, 1908, and September 1, 1910, for the purchase money, their payment being secured by a duly recorded mortgage upon the threshing outfit. All the notes which matured prior to September 1, 1910, were paid, leaving unpaid, however, a note maturing on that day for $781.00.

The sale was made by Simpson, who acted as agent for appellant; but Simpson was subsequently succeeded by Vanarsdall as appellant's representative in Lexington.

Fishback having concluded that he was not making any money with his thresher, announced that he would have a general sale, at public auction, of all of his stock and farming implements on February 10, 1910. Before the sale Fishback told Vanarsdall of his intention, and says Vanarsdall authorized him to sell the threshing outfit. At the sale Fishback publicly announced there was a mortgage upon the threshing outfit for $781.00; that appellant had authorized him to sell it; but that it would not be sold on a credit of three months, as the other property was to be sold, but on a longer credit that

would make the purchase money become due on September 1, 1910, that being the day his note would be due to the appellant. Fishback says the purpose of this arrangement was for his convenience in using the money that would then be paid to him, to discharge appellant's mortgage note.

Appellee Etherington bought the threshing outfit for $865, for which he gave Fishback his note due about September 1, 1910. About June 12, 1910, Etherington had a conversation with Vanarsdall about his note to Fishback, and Fishback's note to the appellant, in which Etherington claims Vanarsdall told him he could pay the money to Fishback. When Etherington's note matured on September 1, 1910, he paid it to Fishback; and Fishback having subsequently become a bankrupt in the summer of 1911 without having paid the note for $781.00 due the appellant, appellant filed this action on October 6, 1911, against Fishback and Etherington to enforce its lien upon the thresher.

Etherington's defense is that of estoppel; (1) in the authority given Fishback by Vanarsdall to make the sale; and (2) in Vanarsdall's telling Etherington to pay his purchase money to Fishback instead of requiring Etherington to pay the money due on the Fishback note, to the appellant.

Appellant denies the acts of estoppel alleged, or Vanarsdall's authority to so bind it. The chancellor having sustained the defense and dismissed the petition, the plaintiff prosecutes this appeal.

The acts of estoppel relied upon being the conversation between Fishback and Vanarsdall, and the subsequent conversation between Etherington and Vanarsdall, it becomes necessary to see precisely what those conversations were, particularly the one with Etherington.

There is no dispute as to what occurred at the sale. Both Fishback and Etherington agree that Fishback made the public announcement that the threshing outfit was subject to a mortgage, but that he had been authorized by the appellant to sell the property, and that the money realized by the sale would be used to pay off appellant's lien note. Fishback did not propose to make the note payable to appellant; on the contrary, he took the note to his own order. He further says Preston Wil-

liams was present at the time of his agreement with Vanarsdall. Williams did not testify, and his absence is not accounted for by any one.

Upon the subject of his conversation with Vanarsdall, Fishback says:

"I told him I was going to have a sale as I could not make anything on the thresher and wanted to sell it, and asked him if it would be all right to put it up at sale. He asked me if I was solvent. I said I was, which I was at the time. He said it would be all right, and that he had two men who wanted a second hand machine, and he would bring them down; so I went ahead and put the machinery up, and I never saw Mr. Vanadsdall or anybody from Lexington."

Fishback does not claim that Vanarsdall agreed to release appellant's mortgage, or that anything was said on that subject.

In telling of the payment of Etherington's note, Fishback said:

"Q. Was the note made payable at the time the other notes for the balance of the property were made payable? A. No, it was due before; I think the 15th of September was the time we had this note to fall due. It was before that, and the money was just put to my credit there and I had some rent to pay and I just checked on it. I did not know at the time that I was checking on that money. I really did not know what I had in bank."

Vanarsdall's version of the conversation with Fishback is as follows:

"Q. Did you ever have any transactions with the defendant Fishback relative to the note in controversy in this case? A. I had nothing except some conversation with him in regard to it; no contract, no agreement. Q. Did you ever give him permission to sell the threshing outfit covered by the mortgage in this case? A. No, sir. Q. Prior to his sale of this threshing outfit, did you have any conversation with him at all about it, and if so, state in detail what it was? A. Mr. Fishback came into my office up there prior to selling this outfit and told me that he wanted to sell it—was going to sell it at his sale, and asked me what about it? I said, 'You understand you are selling mortgaged property, and you know what the penalty is for it. 'But,' I said, 'I suppose you are good for it anyhow?' And he said he was. 2. Do you recall any other conversation with him on that occasion? A. He

said he was going to sell it and make the note mature about the same time with the note that the company held against him, and have this money to pay the note—have the proceeds of this sale to pay that note. Q. Did you, or not, tell him to go ahead and have the sale, that you would have men there to bid on the property, tell him it would be all right for him to go ahead and make the sale? A. No, I didn't tell him that. Q. Did he tell you that he could not make anything out of the rig and he was going to sell it, and ask you if it would be all right for him to put it up at that sale? A. I don't remember that he gave me any reasons for selling it at all; he just said he was going to sell it. Q. Did you tell him it would be all right for him to go ahead and sell it? A. No, sir; I didn't tell him it would be all right."

Concerning the subsequent conversation between Etherington and Vanarsdall, Etherington testified as follows:

"Q. Did you have any conversation with him (Vanarsdall) at that time in Lexington about the note that you had executed at the public sale for the thresher? A. Yes, sir. Q. What conversation was that? A. I told him, the day that that note that Mr. Fishback holds against me and against this thresher, I said 'It will be paid that day. If you want to look after the money, you can do so.' He said, 'Don't you let the Fishback paper —don't have any thought about that, because George is good, is perfectly good to us for the money.' "

Etherington further says he thought Fishback was "perfectly good" and that his note to appellant would be paid; and although he says he relied upon Vanarsdall's statement and would not have paid his money to Fishback except for that statement, he further admits that he paid his money to Fishback because he thought Fishback was "good" and would settle with appellant, and that he relied upon Fishback to make that payment. This is made plain by the following extract from Etherington's cross-examination:

"Q. You relied upon him (Fishback) to make that payment himself? A. Yes, sir. Q. You paid the note then to Fishback because you thought he was good and he would settle with the company? A. Yes, sir. Q. Would you have done that and thought that he was good even though nothing had been said to you by Mr. Vanarsdall? A. Yes, sir; certainly. * * * Q. You considered

him (Fishback) perfectly honest, perfectly reliable, and perfectly good? A. Yes, sir. Q. And relied on that? A. Yes, sir. * * * Q. You said to him (Vanarsdall) that you were going to pay the note when it was due? A. Yes, sir. Q. And that he had better be there? A. No, I said, 'If you want to look after it you can do so.' Q. You told him that you were going to pay it to Mr. Fishback? A. I said I was going to pay it on the day it was due. Q. To Mr. Fishback? A. Of course, that meant to Mr. Fishback. Q. If he wanted to look after it he could do so? A. Yes, sir. Q. His reply was, 'You need not worry about the Fishback note? A. Yes, sir. * * * Q. You knew at that time there was a mortgage against it? A. Yes, sir. Q. He didn't say he would release the mortgage? A. No, sir; he never said that."

Vanarsdall says his conversation with Etherington was as follows:

"Q. Did you ever at any time direct Mr. Etherington, a defendant in this case, or authorize him to pay the note which he gave for the machinery at the sale, to Mr. Fishback? A. No, sir. Q. Did you ever have any conversation with Mr. Etherington about his purchase of this rig after it was purchased, and relative to the payment of the note executed by him? A. The day Mr. Etherington came up there about these repairs and told me he had bought it, I said, 'You understand we have a mortgage on that outfit,' and he said he did. I think he asked me when the Fishback note was due, and I said 'it is past due now, but the company has agreed to carry the note until September for him until after he gets his wheat crop threshed this year; but as to him telling me, or me asking him when his note matured, I don't remember that I ever heard when his note matured at all. .Q. Did you say to him that he need not bother himself about the Fishback note, that George was perfectly good to the company, or words to that effect? A. I said to him —I asked him the question if he didn't consider Mr. Fishback good, and he said he did; and I said I thought so too, and I suppose it will be paid all right. Q. Did you tell him not to worry himself about it, or anything of that sort? A. I don't think I did; if I said it I don't remember it. Q. Did Mr. Etherington say anything to you about who he should pay the note to? A. No, sir. Q. Or whether he should pay it to you? A. No, sir. Q. Did he say anything about—did he tell you to be present, or

if you wanted to be present when the note was paid that you could look after it?. A. No, sir. Q. Did he tell you anything about when he was going to pay the note? A. No, sir; I didn't know when the note matured, and I don't know yet."

It will be observed that while Etherington says Vanarsdall told him Fishback was good for the company's money, Vanarsdall says he asked Etherington if Fishback was "good;" and that upon Etherington saying he thought Fishback was "good," Vanarsdall assented, saying he thought so too, and supposed the Fishback note would be paid. In other words, Etherington makes the statement as to Fishback's solvency come from Vanarsdall while Vanarsdall makes it come from Etherington. Etherington had known Fishback for nearly a lifetime; Vanarsdall knew him scarcely at all.

Passing the question of Vanarsdall's authority to bind appellant to a release of its mortgage, which we deem unnecessary to decide, the single question for determination is: Did the statement of Vanarsdall to Etherington estop appellant from asserting its mortgage lien upon the thresher?

The conversation between Fishback and Vanarsdall is unimportant, since it is admitted Vararsdall was not present at the sale in February when Etherington bought the thresher, and Etherington relies solely upon Vanarsdall's subsequent statement to him in June.

The elements essential to an estoppel are stated as follows, in 16 Cyc., 726:

"In order to constitute an equitable estoppel there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice."

Substantially the same rule is announced in Bispham's Equity, section 805, and in Bigelow on Estoppel (5th Ed.), 570.

The rule has its foundation in the necessity of compelling the observance of good faith; but a man cannot be prevented by his conduct from asserting a previous right, unless the assertion would be an act of bad

faith towards a person who had subsequently acquired the right. Bispham's Eq., section 282.

In Patterson v. Lytle, 11 Pa., 53, it is said:

"The principle runs through the whole doctrine of estoppel, that a man is only prevented from alleging the truth when his assertion of a falsehood, or his silence has been the inducement to *action* by the other party, which would result in loss if the opponent was permitted to gainsay what he had before asserted, or induce the other to believe by his acts."

Laying aside Vanarsdall's version of the conversation, and looking alone to Etherington's testimony, it will be seen his only claim of misrepresentation consists in Vanarsdall's telling him not to worry about the Fishback note because Fishback was perfectly good to the company for the money. But two of the elements necessary to constitute an equitable estoppel are, (1) that the party to whom the statement was made must have been without knowledge or the means of knowledge of the real facts, and (2) the party to whom the representation was made must have relied on and acted upon it.

Giving Etherington's testimony its full value, he has failed to satisfy either of these two requirements, since it clearly appears that he knew much more than Vanarsdall did of Fishback's financial condition; and he expressly admits, upon cross-examination, that he made the payment to Fishback because he thought he was financially "good," and would have done it regardless of Vanarsdall's statement as to Fishback's solvency.

Etherington makes no claim whatever that Vanarsdall ever promised to release the mortgage, or ever said anything about releasing it.

A valid mortgage, duly recorded, should not be lightly annulled; and while we recognize that under the doctrine of equitable estoppel a mortgagee of personal property may release or waive his lien, it should never be done unless the evidence thereof be clear, full and satisfactory.

Etherington's testimony is of itself insufficient to establish the estoppel relied upon; and, since he has the burden to show the release and is contradicted by Vanarsdall upon every material point, his defense must necessarily fail.

Judgment reversed and action remanded, with instructions to enter a judgment as prayed in the petition.